**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LIGGETT GROUP LLC, VECTOR TOBACCO
INC., and XCALIBER INTERNATIONAL LTD.,
LLC,

Plaintiffs,

v.

STATE OF COLORADO, by and through JARED S.
POLIS, in his official capacity as Governor of
Colorado, PHILIP J. WEISER, in his official capacity
as Attorney General of Colorado, and the
LEGISLATIVE COUNCIL of the COLORADO
GENERAL ASSEMBLY,

Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs Liggett Group LLC ("Liggett"), Vector Tobacco Inc. ("Vector"), and

Xcaliber International Ltd., LLC ("Xcaliber"), three out-of-state discount cigarette manufacturers,

bring this action to challenge as unconstitutional a provision mandating a minimum retail price for

cigarettes sold in Colorado, which is contained in Colorado House Bill 20-1427 (the "Bill"), a bill

increasing taxes on cigarettes sold in Colorado.  Not only is that fixed minimum price provision –

Section 10 of the Bill – unconstitutional under, among other things, the Commerce Clause of the

U.S. Constitution, it was rushed through the Colorado General Assembly and presented to the

voters without complying with Colorado's constitutional requirements.

2.      The Bill, a legislative ballot referral, would impose hundreds of millions of dollars in new and increased taxes on cigarettes and other nicotine products.[1]  Section 10 of the Bill, which establishes a minimum price for all cigarettes, was added to the Bill in a "back-room" deal to ensure that Philip Morris USA, Inc. ("Philip Morris"), by far the largest premium cigarette manufacturer in the country, would not spend millions of dollars to defeat the Bill, as it had successfully done with previous cigarette tax bills in Colorado.  Philip Morris wanted Section 10 added to the Bill because it would severely damage the ability of discount cigarette manufacturers to compete with Philip Morris and would solidify Philip Morris's market dominance in Colorado.

3.      Section 10 thus imposes a patently anti-competitive fixed minimum price for all cigarettes sold in Colorado, and directly and without justification harms interstate commerce. Unlike other portions of the Bill, Section 10 is not a tax but a unique method employed by the State to inflate cigarette prices artificially.  Section 10 benefits Philip Morris and other premium cigarette manufacturers at the expense of Plaintiffs by fixing the retail price of all cigarettes sold in Colorado at premium price levels, thereby eliminating by fiat price competition by Plaintiffs and other discount tobacco manufacturers, and benefitting in-state retailers, who get to pocket the price increase, at the expense of out-of-state discount manufacturers.  By contrast, all other states which have raised cigarette prices without utilizing an excise tax have done so not by fixing an artificial minimum price benefitting one segment of the market over another, or by favoring in-state interests over out-of-state interests, but rather by increasing all manufacturers' prices by a

_____

[1] A copy of the Bill is attached hereto as Exhibit A.

fixed percentage, thus raising prices for everyone proportionally while preserving market competition.

4.      Crucially, Section 10 will benefit not only Philip Morris, but also in-state retailers, who will collect and keep a significant portion of the additional proceeds resulting from the state-imposed minimum retail price of discount cigarettes, and thus be able to sell fewer discount cigarettes at higher profit margins.  This comes at the expense of Plaintiffs and other out-of-state discount cigarette manufacturers, who, as a result of Section 10, will lose sales, profits, and market share.  Section 10 also creates regressive and patently unfair burdens on Colorado consumers by imposing much higher costs on those who smoke discount brand cigarettes, typically price-sensitive older and lower income people.  Section 10 will cost the discount brand smoker as much as $800 per year, more than twice as much as premium brand users, many of whom will see no price increase.

5.      Section 10 violates the Commerce Clause because it discriminates against out-of-state discount cigarette manufacturers in favor of in-state retailers, imposes an undue burden on interstate commerce by, among other things, interfering with the interstate sale of cigarettes, and causes negative extraterritorial effects on the cigarette market outside of Colorado.  It violates the Due Process Clause because, without any legitimate justification, it deprives Plaintiffs of protected property interests.

6.      Section 10 is void also because it was passed by the Colorado General Assembly in violation of procedural and substantive requirements of Colorado's Constitution, including, among others, requirements for full and fair debate in legislative committees and the General Assembly before passage.  The Bill was rushed through the legislative process in this fashion in

the last four days of the 2020 legislative session, plainly to avoid opposition by the Plaintiffs and the other parties who would have been able to point out the patent constitutional and other injustices of the Bill. As many legislators commented on the record, they were not given copies of the Bill in advance, as required by Colorado law, and did not even have an opportunity to read it. And, because the Bill concerns taxes, it must, under the Colorado Constitution, be approved directly by the voters and is slated to be on the November 2020 ballot ("Proposition EE"). However, in violation of the Colorado Constitution, neither the title of the Bill nor the ballot question identifies Section 10 or its contents, thus failing to inform voters that the price of cigarettes will be artificially fixed at premium prices if Proposition EE is approved.

7.      Accordingly, Plaintiffs seek preliminary and permanent injunctive relief precluding the enforcement of Section 10.

## II.     __JURISDICTION AND VENUE__

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because the matter in controversy arises under the laws and Constitution of the United States.

9.      This Court is authorized to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the State of Colorado is a Defendant, and all other Defendants either reside in or perform their official duties in this judicial district, and because a substantial part of the events giving rise to this action occurred in this judicial district.

### III.   <u>PARTIES</u>

11.   Plaintiff Liggett Group LLC ("Liggett") is a Delaware limited liability company, with its principal place of business in Mebane, North Carolina.  Liggett and its predecessors in interest have been engaged in the business of manufacturing cigarettes for over 120 years.  Liggett sells its products throughout the United States and in the State of Colorado through a network of distributors and retailers.

12.   Plaintiff Vector Tobacco Inc. ("Vector") is a Virginia corporation, with its principal place of business in Morrisville, North Carolina.   Vector is in the business of manufacturing cigarettes and sells its products throughout the United States and in the State of Colorado through a network of distributors and retailers.  Liggett and Vector are both indirectly owned by Vector Group Ltd.

13.   Plaintiff Xcaliber International Ltd., LLC ("Xcaliber") is an Oklahoma limited liability company, with its principal place of business in Pryor, Oklahoma.  Xcaliber is in the business of manufacturing cigarettes and sells its products throughout the United States and in the State of Colorado through a network of distributors and retailers.

14.   Defendant State of Colorado (the "State" or "Colorado"), operating through legislative and executive action, adopted the Bill, which includes statutory mandates forbidden by the laws of Colorado and the United States.  Defendant State of Colorado has acted through its officers, agents and duly elected representatives, including Defendants Jared S. Polis, as Governor of Colorado, Paul Weiser, as Attorney General of Colorado, and the Legislative Council, among others, to injure the Plaintiffs' constitutional rights and other rights protected under the laws of Colorado and the United States.

15. Defendant Jared S. Polis, sued in his official capacity, is the Governor of Colorado and, in that capacity, has the power to enforce the laws of the State of Colorado and is required by the Colorado Constitution to ensure that all laws of the state are faithfully executed.  Colo. Const. art. IV, § 2.  In his capacity as an agent of the State of Colorado, Defendant Governor Polis has injured Plaintiffs' constitutional rights and other rights protected under the laws of Colorado and the United States.

16. Defendant Philip J. Weiser, sued in his official capacity, is the Attorney General for the State of Colorado and, in that capacity, enforces the laws of the state of Colorado.  In his capacity as an officer and agent of the State of Colorado, Defendant Attorney General Weiser has injured Plaintiffs' constitutional rights and other rights protected under the laws of Colorado and the United States.

17. Defendant Legislative Council is a committee of the General Assembly tasked, among other things, with preparing and approving the ballot information booklet that provides Colorado voters with information about ballot measures in advance of elections.

IV.    **FACTUAL ALLEGATIONS**

A.    **Plaintiffs Sell Cigarettes In Interstate Commerce For The Discount Segment Of The Cigarette Market**

18. Plaintiffs are tobacco companies based outside of the State of Colorado which manufacture and sell cigarettes in interstate commerce throughout the United States.  They compete by pricing their respective cigarette brands lower than most other domestically sold brands, which positions the companies in the "discount segment" of the domestic cigarette market. Plaintiffs sell their cigarettes to consumers in Colorado through distributors and retailers.

19.     Liggett is the operating successor to the Liggett & Myers Tobacco Company, which owned and sold premium brand cigarettes, such as Chesterfield, L&M and Lark.  Beginning in the 1980s, Liggett began to de-emphasize its focus on its premium brands and pioneered what is today the discount segment of the tobacco market, by competing largely based on price, rather than image and advertising.  In 1998, Liggett sold its remaining rights to the Chesterfield, L&M and Lark brands to Philip Morris, and today Liggett operates by selling branded products exclusively in the discount segment of the cigarette market.  Liggett also manufactures several private label brands that are sold and distributed by certain retail customers.  Liggett sells the discount cigarette brand Pyramid in Colorado through retailers in Colorado at an average retail price of $5.28 per pack.  While Liggett sells other discount brands in the State, the Pyramid brand constitutes over 98% of Liggett's product sold in Colorado.

20.     Vector is a discount cigarette manufacturer specializing in deep discount cigarette products.  Vector sells the discount cigarette brand Eagle 20's in Colorado through in-state distributors and retailers at an average retail price of $4.59 per pack.  The Eagle 20's brand is the only Vector brand sold in Colorado.

21.     Xcaliber was founded in 2001 and manufactures a variety of tobacco products, including cigarettes and cigars.  Xcaliber sells cigarettes exclusively in the deep discount segment of the market.  Xcaliber sells discount brands Echo and Edgefield in Colorado through in-state distributors and retailers, at an average retail price of $5.40 per pack and $4.00 per pack, respectively.

22.     In 1996 and 1997, Liggett began focusing exclusively on the discount market, after breaking ranks with the major domestic tobacco companies to become the first domestic tobacco

company to settle smoking and health-related litigation, including by entering into the first-ever settlements of Medicaid expense recovery litigation brought by state attorneys general against the major domestic tobacco companies.  As part of these landmark settlements, Liggett agreed to change the way it marketed and sold its cigarettes, including by, among other things, stating publicly that "smoking is addictive" and causes serious diseases and death, adding warnings regarding addiction to its cigarette packs, and discontinuing virtually all conventional consumer advertising and marketing of its cigarette products.

23.     Liggett's settlements and its cooperation with the state attorneys general and public health authorities -- widely recognized as historic -- were key to enabling the attorneys general of all fifty states, including Colorado, to recover more than $200 billion in Medicaid expenses on behalf of the states from the major domestic tobacco companies.  These global settlements also resulted in revolutionary changes in the way the domestic tobacco industry operates, including through advertising and marketing restrictions and smoking and health warnings.

24.     Currently in the U.S. market, there are certain established premium brand cigarettes, such as Philip Morris's Marlboro, which command higher prices based on name or brand recognition.  Most, if not all, of the premium cigarette brands which exist today were established long before the revolutionary industry changes resulting from the Liggett settlements in the 1990s.  Since those changes, it has become virtually impossible to create, support or launch a new premium brand cigarette product.

25.     The limited set of recognized premium brand cigarettes in the industry have a competitive advantage in the domestic cigarette market, based on market share and brand recognition, over all discount cigarette brands.  Liggett, Vector, Xcaliber, and other discount

manufacturers cannot compete with the much larger Philip Morris and other premium manufacturers by using conventional consumer advertising to create a premium brand, but rather compete almost exclusively on price.

26.     Accordingly, Plaintiffs must compete vigorously to maintain their presence in national and state markets dominated by Philip Morris and other premium manufacturers.

**B.     If Enforced, Section 10 Would Cause Irreparable Harm To Plaintiffs And Consumers**

27.     Section 10, if enforced, will impose much greater price increases on discount cigarettes than on premium cigarettes, thus causing irreparable harm to the tobacco manufacturers which make them and the consumers who purchase them, while leaving premium cigarette manufacturers largely unaffected.  Plaintiffs and other out-of-state discount manufacturers will thus be prevented from selling cigarettes at lower prices, resulting in a windfall to in-state retailers at the expense of Plaintiffs and other out-of-state discount manufacturers.

28.     The current Colorado cigarette tax is $0.84 per pack, which the Bill would increase by $1.10 to $1.94 per pack effective January 1, 2021, with additional increases taking effect in July 2024 and thereafter.  *See* Bill, Section 3.  Separately, Section 10 of the Bill also sets a minimum price for the retail sale of all cigarettes in Colorado at $7.00 per pack effective January 1, 2021, increasing to $7.50 effective July 1, 2024.  The tax portion of the higher cigarette prices resulting from the Bill is collected by in-state distributors, which are charged with applying the tax stamp to the pack and remitting the tax to the State, collecting a small fee for doing so.  The non-tax portion of the higher cigarette prices resulting from Section 10 is collected at the point of sale by in-state retailers, who simply keep it.  None of those proceeds go to the State.

29.     Discount cigarettes are currently selling in Colorado at average retail prices between $3.80 – $5.32.  Section 10 would harm discount brand manufacturers because it mandates that the retail price of all discount cigarettes must increase to a minimum of $7.00 per pack as of January 2021, which is a price increase greater than the $1.10 per pack of tax imposed by the Bill. By the same token, Section 10 would benefit in-state retailers, as well as Philip Morris and other premium cigarette sellers which will not be affected by the Section 10 portion of the increase because their products already sell near or above the Section 10 minimum price.  For example, a pack of Marlboro which currently sells in Colorado for $6.55 per pack would increase to $7.65 per pack, with the entire price increase resulting from the $1.10 per pack tax increase, and none of it from Section 10.  The problem is compounded further as the Bill mandates increases in the minimum price per pack in later years.

30.     Such price increases distort the market because the discount products that previously sold between $3.80 and $5.32 will no longer be able to compete against each other based on price, because all must increase their prices to  the same $7.00 minimum, or against the premium cigarettes, because there will be no material difference in price.

31.     The Bill also has regressive and patently unfair consequences to consumers, by imposing higher costs on Coloradans who smoke discount brand cigarettes.  For example, a smoker who currently purchases Marlboro or another premium brand cigarettes for $6.50 per pack will pay $7.60 per pack, an increase of $1.10 per pack entirely from the new State cigarette excise tax. However, smokers who use discount brands will incur the new cigarette excise tax increases, plus the mandatory price increases imposed by Section 10.  Thus, a smoker who currently purchases a discount brand cigarette in Colorado at $4.60 per pack will experience a mandatory $2.40 increase

($1.10 per pack in tax, and an additional $1.30 per pack solely because of the $7.00 minimum price law).

32.     Section 10 will benefit not only Philip Morris, but also in-state retailers who will collect and keep a significant portion of the additional proceeds resulting from the state-imposed minimum retail price of discount cigarettes.  Because Section 10 substantially increases the retail price of discount cigarettes in excess of the cigarette tax increase, the non-tax portion of the higher price goes into the pockets of in-state retailers.  Retailers will therefore be able to sell fewer discount cigarettes at higher profit margins.  This comes at the expense of Plaintiffs and other out-of-state discount cigarette manufacturers, who will lose sales, profits, and market share as a result of Section 10.  Many in-state retailers recognize that they will increase their per unit profit margins on discount cigarettes as a result of Section 10, a benefit they did not ask for and do not want because of the long term negative impact that the Bill will have on their overall business.  Neither the State nor the discount tobacco manufacturer receives the benefit of the non-tax portion of the higher price resulting from Section 10.

33.     If Section 10 is enforced, the retail price of Plaintiffs' products will be artificially raised, benefitting Philip Morris.  The immediate result will be an unfair and disproportionate price increase for those buying discount cigarettes in Colorado.  In the short term, the in-state retailers will unjustly benefit at the expense of out-of-state tobacco manufacturers, by pocketing the non-tax portion of the Section 10 increase.  In the longer term, the demand for these overpriced discount products will diminish.  Section 10 will severely interfere with the ability of Plaintiffs to compete, causing them to lose sales and profits and benefitting Philip Morris, which will gain market share at their expense.  The ultimate result will be to drive most, if not all, discount cigarettes from the

Colorado market, causing avoidable and irreparable economic harm to Plaintiffs, similarly situated discount tobacco manufacturers, and consumers of their products.

**C.    Philip Morris Has Spent Millions Of Dollars Successfully Opposing Cigarette Tax Increases In Colorado**

34.    For years, Colorado's efforts to raise tobacco taxes have been frustrated because of opposition funded by Philip Morris in the form of multi-million dollar anti-tax campaigns.  In the years preceding the enactment of the Bill, there were two unsuccessful attempts by Colorado to increase taxes on cigarettes and other tobacco products.

35.    In a back-room deal, Defendants added Section 10 to garner Philip Morris's support and guarantee that the company would not mount another multi-million dollar campaign opposing the tax hike in the Bill.

**1.    Philip Morris's Opposition To Amendment 72**

36.    In 2016, a citizen's ballot initiative was proposed, called the Colorado Tobacco Tax Increase, also known as Amendment 72 ("Amendment 72"), followed by proposed legislation in 2019.  Philip Morris, through its agents, lobbyists, and corporate affiliates, including its parent company Altria, spent millions of dollars funding campaigns opposing both Amendment 72 and the proposed legislation in 2019, and both efforts failed to pass.  Much like the current Bill, the primary purpose of Amendment 72 was to increase state taxes by $315.7 million annually by increasing taxes on cigarettes and other tobacco products.

37.    Philip Morris bankrolled an opposition campaign entitled, "No Blank Checks In The Constitution" ("No Blank Checks").  Of the approximately $18.1 million raised by No Blank Checks, Philip Morris contributed about $17.5 million.  As reported, No Blank Checks, acting as Philip Morris's proxy, outspent the group that supported Amendment 72, the Campaign for a

Healthy Colorado, by nearly eight to one.[2]  As reflected in a campaign financing filing, Philip Morris's campaign to defeat Amendment 72 was overwhelming, with at least $14 million spent on polling, research, mailers, consultants and digital and television advertising.  Philip Morris's opposition campaign was successful and Amendment 72 failed.

### 2.   Philip Morris's Opposition To The 2019 Tobacco Tax Bill

38.      In April 2019, Defendant Governor Polis and lawmakers announced another effort to raise taxes on tobacco and nicotine products, proposed legislation HB19-1333 (the "2019 Bill"). Similar to the current Bill, the 2019 Bill was a legislative ballot referral, which would have to be approved by the voters.

39.      As with Amendment 72, Philip Morris spent millions of dollars to fund the opposition group, No Blank Checks for Colorado, to defeat the bill in the General Assembly.  The opposition campaign by Philip Morris, which began even before the 2019 Bill was formally announced, was extensive and far-reaching, including a social media campaign with a website, Twitter account, and Facebook page.

40.      In the days leading up to the Senate vote, Philip Morris hired the most powerful lobbyists in the State and utilized Facebook and social media to mount extensive opposition to the 2019 Bill.  As reported in *The Colorado Sun*, Philip Morris "flooded newsfeeds with 60 sponsored ads" and its Facebook posts were seen between 336,000 and 985,000 times by Colorado users.[3]

---

[2] See Eliza Carter, "Big Tobacco Stubs Out Cigarette Tax," The Colorado Independent, Nov. 9, 2016, https://www.coloradoindependent.com/2016/11/09/amendment-72-colorado/ (Attached hereto as Exhibit B).

[3] Jesse Paul, Eric Lubbers, "Big Tobacco is Fighting Colorado's Nicotine Tax Bill With Powerful Lobbyists And A Social Media Campaign," *The Colorado Sun* (Apr. 30, 2019),

41.     Philip Morris's coordinated and well-funded opposition campaign was successful, as the Colorado Senate voted down the 2019 tax bill in a late-night vote on May 2, 2019, "with no debate or discussion, a remarkable occurrence in a chamber that has seen extended debate on a large number of bills this session." [4]  The tobacco giant emphasized that it would not stand idly by while Colorado attempted to increase taxes on tobacco products.  As its company spokesperson, George Parman, told *The Colorado Sun* at the time, "Philip Morris's tobacco operating companies oppose excise tax increases which place an economic burden solely on adult tobacco consumers. This is particularly true in Colorado, where voters struck down a similar measure in 2016."

### 3.  In 2020, Philip Morris, To Fight Growing Competition From Discount Cigarette Sales, Strikes A Backroom Deal With The State

42.     Before 2020, Philip Morris experienced growing competition from discount cigarette manufacturers.   After the COVID-19 pandemic struck, as Philip Morris's parent company, Altria, publicly stated, Philip Morris feared that the economic downturn would cause more smokers to switch to lower-priced discount cigarette brands, threatening Philip Morris's huge profits as a premium cigarette manufacturer.  In April and May of 2020, Philip Morris's parent company, Altria, publicly stated that it anticipated losing market share and profits to discount cigarette manufacturers in the wake of the COVID-19 pandemic and the consequent economic downturn.  At Altria's annual shareholders meeting on May 14, 2020, Altria's Chief Executive

---

https://coloradosun.com/2019/04/30/colorado-nicotine-tobacco-tax-proposal-opposition/ (Attached hereto as Exhibit C).

[4] Erica Meltzer, "Colorado Senate Rejects Nicotine Tax That Would Have Boosted Preschool Spending," *Chalkbeat Colorado* (May 2, 2019), https://co.chalkbeat.org/2019/5/2/21108100/colorado-senate-rejects-nicotine-tax-that-would-have-boosted-preschool-spending (Attached hereto as Exhibit D).

Officer, Billy Gifford, expressed concerns about economic conditions "that result in adult consumers choosing lower-priced brands including discount brands." Significantly, in late April 2020, Altria withdrew its 2020 earnings guidance because it anticipated the economic downturn would push smokers to switch to cheaper brands.[5] Altria and Philip Morris's fears of losing market share due to the pandemic have been proven correct. As reflected in market analyses, total sales volume for cigarettes decreased by 2.2% in August 2020, and more consumers have been opting for discount cigarette options rather than premium brands.

43.     As Philip Morris was facing its growing discount price competition problem, Defendant Governor Polis and state legislators were moving forward with efforts to fashion yet another Colorado tobacco tax bill. At the same time, Healthier Colorado, a grassroots organization that had supported earlier, unsuccessful efforts to increase tobacco taxes, was pushing Initiative 292, a proposed citizen's ballot initiative for a new Colorado tobacco tax law.

44.     To address the threat posed by discount cigarette brands sold by Plaintiffs and other manufacturers, particularly in Colorado where it faced steep price competition from discount products, Philip Morris decided to seek a fixed minimum price provision in the new Colorado tobacco tax law that would require discount cigarettes to sell at premium price levels, thereby eliminating price competition from discount brands.[6] This anti-competitive measure would

---

[5] Jennifer Maloney, "Altria Sees Smoker Shift From Vaping To Cheap Cigarettes," *The Wall Street Journal* (May 1, 2020), https://www.wsj.com/articles/marlboro-maker-warns-smokers-will-turn-to-cheaper-cigarettes-11588249226?fbclid (Attached hereto as Exhibit E).

[6] Jesse Paul, "Marlboro's Owners Negotiated Colorado's Proposed Tobacco Tax Hike – And It Could Help Them Dominate The Cigarette Market," *The Colorado Sun* (Aug. 13, 2020), https://coloradosun.com/2020/08/13/colorado-tobacco-tax-hike-1427/ (Attached hereto as Exhibit F).

remove any incentive for cash-strapped Philip Morris customers to switch from its premium cigarettes to discount brands and permit Philip Morris to convert discount brand smokers to its premium brands more easily.

45.     Healthier Colorado and Philip Morris, which have historically been on opposite sides of tobacco regulation, thus found common ground.  In or around May 2020, Philip Morris informed Healthier Colorado that it would no longer oppose the proposed tobacco tax increases in Colorado, so long as an acceptable minimum price provision was included in the law; Healthier Colorado agreed to help Philip Morris accomplish that goal in order to secure the tobacco tax increases it desired.  This deal was confirmed by Healthier Colorado's Executive Director, when he appeared before legislative committees to promote the proposed tax increase:  "We have a deal with the largest tobacco company in America, who was the exclusive funder of the opposition campaign last time."

46.     With Philip Morris's lack of opposition confirmed, Defendant Governor Polis, legislative supporters, and other proponents of the Bill, including Philip Morris, worked behind closed doors, keeping information about the proposed Bill and Section 10 from Plaintiffs and other interested parties, and even from other legislators.  Sponsors of the Bill in the General Assembly failed to provide proper notice and hearing, and failed to disclose Section 10 in the title of the Bill, thus precluding full and fair consideration of the Bill on its merits in violation of Colorado law.

**D.     As All Other States Have Done In Raising Cigarette Prices, Colorado Can Raise Cigarette Prices Without Burdening Interstate Commerce**

47.     Cigarettes – the only product Philip Morris was facing increasing competition in selling in Colorado – is the only product subject to the Section 10 minimum price control.  The Bill would impose new or increased taxes on cigars, pipe tobacco, chewing tobacco, snuff, e-

cigarettes, and vaping devices, all of which are calculated as a percentage of the product prices, but does not require those products to be sold for a minimum price.

48.     Moreover, the increased taxes on cigarettes under the Bill take effect gradually, January 1, 2021, July 1, 2024, and July 1, 2027, at which point the tax will be 10 cents per cigarette (or $2.00 per pack).   Section 10 requires that all cigarettes must be sold at $7.00 per pack immediately in January 2021 and then $7.50 by July 1, 2024.   Thus, while the cigarette excise taxes will be implemented gradually, the impact of Section 10, which for some discount cigarette manufacturers, including Plaintiffs, means doubling their current prices, will be felt immediately.

49.     While most have sought to regulate cigarette prices, none have done so by burdening interstate commerce as Section 10 would, by fixing an artificial minimum price.  Rather, every state that has sought to raise cigarette prices without utilizing an excise tax has done so without conferring a windfall on in-state retailers at the expense of out-of-state companies.  States often raise cigarette prices through "minimum mark-up laws," which preserves relative price differences between cigarette brands and ensures market competition.  State minimum mark-up laws are not anti-competitive because they maintain price differences across cigarette brands sold by competitors, instead of mandating a fixed minimum retail price.  Minimum mark-up laws promote fair trade by requiring wholesalers and retailers to mark-up cigarette prices by a minimum percentage over the price they paid, so there is no windfall for them to keep.

50.     In short, had Colorado sought to raise cigarette prices more than the taxes will, the State could have done so without interfering with interstate commerce through minimum mark-ups (or through increased excise taxes).  Doing so would have served the State's goal of raising prices and generating more revenue, without harming Plaintiffs or their customers, or permitting a

substantial portion of the price increase to flow arbitrarily to in-state tobacco retailers rather than to the State treasury.

      **E.**      **The Bill Unduly Burdens And Interferes With Interstate Commerce In Violation Of The Commerce Clause Of The United States Constitution**

      51.      If not enjoined, Section 10 will place an undue burden on interstate commerce in three principal ways: (i) by unfairly favoring in-state tobacco sellers and discriminating against out-of-state discount tobacco manufacturers, including Plaintiffs; (ii) by interfering with the interstate sale of cigarettes in the United States; and (iii) by causing negative extraterritorial effects on the pricing, marketing and sale of cigarettes and on tobacco companies beyond the State of Colorado.

      52.      First, in what amounts to state economic protectionism prohibited by the Commerce Clause, Section 10 discriminates against out-of-state discount cigarette manufacturers for the benefit of in-state retailers.

      53.      Cigarette manufacturers, like Plaintiffs, sell their respective cigarette products to wholesale buyers who purchase those products for re-sale and distribution throughout the United States.  Cigarette manufacturers sell to such wholesalers, not at manufacturer's list prices on a state-by-state basis, but rather at one material price for each such product.  Cigarette manufacturers routinely compete on price based on raising or lowering their list prices.

      54.      Section 10 substantially reduces or eliminates the ability of Plaintiffs and other out-of-state tobacco manufacturers to sell their products in Colorado because it imposes a substantial price increase disproportionately on their discount cigarette products at the retail level, while the in-state retailers collect a windfall from the increased prices,

55.     With its discriminatory effects against out-of-state cigarette manufacturers and unfair benefits to in-state retailers, Section 10 is the kind of preferential treatment and naked state protectionism that the Commerce Clause prohibits.  Because of the long-standing, interstate economic regime for the wholesale pricing, sale and distribution of cigarettes, Section 10 compels Plaintiffs and other out-of-state discount cigarette manufacturers to suffer lost sales and profits in Colorado, and forecloses their ability to compete and maintain market share, for the benefit of Colorado State interests and in-state retailers of their products.

56.     Second, Section 10 burdens interstate commerce to a degree not justified by any potential state interest.  The State's asserted purpose for the Bill is to pay down deficits, fund education and housing programs, and other identified appropriations.  Section 10 furthers none of these state interests because the proceeds it generates from Colorado consumers go not to the State, but to in-state retailers.  In fact, Section 10 is contrary to legitimate state interests.  It will decrease competition, product choice, and tax revenue collected on cigarettes because of the artificial higher retail prices it imposes, and will assist Philip Morris in solidifying its dominant market position in Colorado.  It will also inhibit the lawful movement of goods, particularly discount cigarettes, in interstate commerce.  And to the extent the state had an interest in increasing prices, it could have done so through higher excise taxes or minimum mark-up laws, without burdening interstate commerce.

57.     Third, if not enjoined, Section 10 will create impermissible extraterritorial burdens on interstate commerce, by distorting the market for cigarettes beyond Colorado's border and affecting commerce and regulation in other states.  Section 10 will not only undermine discount manufacturers' ability to price their own products and compete freely within the industry, it will

undermine and challenge the long-standing regime for the regulation, sale, pricing and distribution of cigarettes at the wholesale and retail levels throughout the United States.  In response to Colorado's price-fixing law, other states may need to modify their existing cigarette regulations and tax policies and adopt similar measures that will only further complicate tobacco pricing, sales and taxation.  Ultimately, if price-fixing of this kind were to proliferate, discount tobacco manufacturers will have no means to price and sell their products effectively, leaving big tobacco companies like Philip Morris with full control over pricing in the domestic cigarette market.

58.    Under the Commerce Clause, such far-reaching interference with interstate and national commerce is prohibited to the states and reserved only for Congress.  Colorado may not, consistent with the Commerce Clause, regulate and disrupt the national market for a consumer product, particularly a product like cigarettes which is and has been the subject of significant federal laws and regulations.

**F.    Enforcement Of Section 10 Should Be Enjoined Because It Violates Article V, Section 21 of the Colorado Constitution**

59.    In contravention of Article V, Section 21 of the Colorado Constitution ("Section 21"), the Bill contains more than a single subject, and the title of the Bill fails to clearly express the full contents of the Bill.

60.    Under Section 21, bills in Colorado must be limited to a single subject, and that subject must be clearly described by the bill's title.  If a bill title does not clearly express certain content in a bill, that omitted content is void:

> No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.

Colo. Const. art. V, § 21.

61.     The Bill's title, however, reads in full as follows:

> CONCERNING THE TAXATION OF PRODUCTS THAT
> CONTAIN NICOTINE, AND, IN CONNECTION THEREWITH,
> INCREMENTALLY INCREASING THE CIGARETTE TAX
> AND THE TOBACCO PRODUCTS TAX; EXPANDING BOTH
> OF THESE TAXES TO APPLY TO SALES TO CONSUMERS
> FROM OUTSIDE OF THE STATE; CREATING AN
> INVENTORY TAX THAT APPLIES WHEN THE CIGARETTE
> TAX INCREASES; CREATING A MINIMUM TAX AMOUNT
> FOR MOIST SNUFF TOBACCO PRODUCTS; CREATING A
> TAX ON NICOTINE PRODUCTS THAT IS EQUAL TO THE
> TOTAL TAX ON TOBACCO PRODUCTS; ESTABLISHING
> NEW RATES FOR CIGARETTES, TOBACCO PRODUCTS,
> AND NICOTINE PRODUCTS THAT ARE MODIFIED RISK
> TOBACCO PRODUCTS THAT ARE HALF OF THE
> STATUTORY TAX; REFERRING A BALLOT ISSUE FOR
> PRIOR VOTER APPROVAL FOR THE NEW AND INCREASED
> TAXES; AND ALLOCATING THE NEW TAX REVENUE.

62.     In violation of Section 21, the title of the Bill makes no reference to Section 10 or its contents, and Section 10 is not expressed at all, let alone "clearly expressed."  Similarly, the ballot question for Proposition EE also fails to identify or refer to Section 10 or its contents.

63.     Moreover, the Bill impermissibly includes a subject other than the cigarette and tobacco taxes expressed in the Bill's title.  Because Section 10 is not a tax, it constitutes a separate and distinct second subject, in violation of Section 21.

64.     Accordingly, Section 10 is void and unenforceable as unconstitutional under Article V, Section 21, of the Colorado Constitution.

### G.     Legislators Rushed The Bill Through The General Assembly And Failed To Consider It On Its Merits

65.     In the last four days of the legislative session, sponsors of the Bill rushed it through the legislature without notice, hearing or opportunity for deliberation and debate.  While lobbyists

working on behalf of Philip Morris had advance knowledge of the consideration of the Bill, the public, and opponents of the Bill, did not.

66.    Introduced on June 11, 2020, the Bill was passed only four days later, on June 15, 2020.  As a result, legislators considering the Bill did not have ample time to read it, deliberate on it, or consider it on the merits.

67.    Prior to June 11, 2020, when the Bill was introduced, there is virtually no reference in the legislative record, media, or other sources of any discussions about a potential tobacco bill, much less that the General Assembly was considering voting on such a bill.

68.    Reports from June 11, 2020, the day the Bill was introduced in the House, show that the Bill was already being discussed in the House Finance Committee "only minutes after it was posted on the legislature's website."  Further, the Bill was presented to the House Finance Committee at the Committee meeting, with no previous warning or discussion about its contents. Based on official recordings of the House Finance Committee meeting that took place on June 11, 2020, at the very beginning of this meeting, one of the sponsors of the Bill, Representative Yavira Caraveo, noted that "[the Bill has] all come kind of fast and furious in these last few days."

69.    Representative Shannon Bird admitted during the meeting, "I haven't read the Bill and don't have questions formulated yet.  I don't know enough to ask but I love the policy behind it."  Representative Bird voted in favor of the Bill only minutes later, despite admitting that she had not even read the Bill and knowing nothing about the Bill aside from the broad policy statements made by Representative Caraveo.

70.     Other representatives, however, were unwilling to approve the Bill because they had not been given sufficient time to read it.  Representative Shane Sandridge, for example, voted against the Bill "just because I have to read it."

71.     Another legislator, Representative Janice Rich of Grand Junction, stated: "We got this bill after we even sat down in here. It's 43 pages and I looked at the fiscal note too, and I just can't support it right now."

72.     The only non-legislators who spoke during the House Finance meeting were Jake Williams, Executive Director of Healthier Colorado (who was aligned with the Bill sponsors), and Bill Jaeger, Vice President of Early Childhood & Policy Initiatives with the Colorado Children's Campaign, both supporters of the Bill.

73.     After considering the Bill for less than twenty minutes, the House Finance Committee passed it 6-5, notwithstanding the fact that the only two witnesses who testified before the committee were supporters of the Bill, and the Committee members did not even have enough time to read the Bill before casting their votes, much less to consider the Bill on its merits.

74.     That same day, less than three hours later, the Bill was before the House Appropriations Committee.  Per the audio recording on the General Assembly's website, the Committee spent less than two minutes on the Bill—just enough time for the chair of the Committee to recommend the Bill be sent to the entire House for passage and for the Committee members to vote 6-5 in favor of the Bill.

75.     The next day, June 12, 2020, the House passed the Bill at 8:40 p.m. on third reading and the Bill was introduced in the Senate.  Importantly, the Bill's full title was not read at this time.

Rather, the record reflects that only the incomplete Bill title was read, followed by a brief discussion regarding an amendment to the Bill, before the legislators voted.

76.     In the Colorado Senate, the Bill was assigned to the Finance and Appropriations Committees.  The Senate Finance Committee discussed the Bill for approximately half an hour. But as the Bill had only been made public the previous day, the limited testimony provided during the hearing, per the Committee audio recordings, was primarily from Mr. Williams, the Executive Director of Healthier Colorado (who less than a month before had been promoting Initiative 292). While Mr. Williams was able to appear before both the House and Senate Finance Committees, other interested parties, including Plaintiffs, only became aware of the Bill after it was passed.  The Senate Finance Committee passed the Bill by a vote of 4-3 shortly before midnight on June 12, 2020.

77.     The very next day, Saturday, June 13, 2020, the Bill passed the Senate Appropriations Committee.  As demonstrated by the official electronic recording of the Committee meeting, the Bill was purportedly discussed for less than one minute before the senators voted. The Committee then passed the Bill by a 6-4 vote.

78.     On Monday, June 15, 2020, the Senate passed the Bill (with minimal amendments) and sent it back to the House for approval where the House passed the Senate version of the Bill. Finally, on July 8, 2020, Defendant Governor Polis signed the Bill, approving it to appear on the ballot in November.

**H.      The Ballot Information Booklet Does Not Provide Sufficient Information Concerning The Bill**

79.     When propositions are before the voter, the Colorado Constitution requires that voters be provided with a ballot information booklet ("Blue Book"), which is prepared by the

Legislative Council and is supposed to provide voters with accurate information concerning ballot measures.  In particular, the Colorado Constitution requires that the Blue Book include "[a] fair and impartial analysis of each measure, which shall include a summary and the major arguments both for and against the measure, and which may include any other information that would assist understanding the purpose and effect of the measure."  Colo. Const. art. V, § 1 ¶ 83.  The Blue Book with respect to the Bill failed to meet these requirements, causing confusion on the part of voters and increasing the probability that voters will misunderstand or be unaware of important components of the Bill that will directly affect them.

80.     The Blue Book states that the Bill "sets the minimum after-tax price of cigarettes for consumers at $7.00 per pack beginning in January 2021, and $7.50 per pack beginning in July 2024."  While the Blue Book refers to harm to businesses that sell low-cost products, it does not explain the anti-competitive effects on cigarette manufacturers or the severity of the cost increases for Coloradans who purchase discount cigarettes.

81.     On September 1, 2020, on behalf of itself and similarly situated discount cigarette manufacturers, Liggett submitted written testimony, including proposed changes to the language of the Blue Book regarding the Bill (or Proposition EE), to the Legislative Council concerning the increased cost per year to Colorado cigarette consumers and the anti-competitive effects resulting from Section 10, as well as additional information about the proposed allocation and spending of revenue from the Bill.

82.     The written testimony and proposed amendment by Liggett sought to correct inaccuracies and omissions in the Blue Book concerning Proposition EE.  Specifically, the amendment would have clarified: (a) the anti-consumer and anti-competitive impact of Section 10,

including the increased costs on discount cigarette smokers per year; and (b) how revenue generated by Proposition EE will be spent.

83.     The amendment to the Blue Book proposed by Liggett, and rejected by Legislative Council, would have cured material omissions in the Blue Book, and enhanced the accuracy and transparency of the Blue Book, regarding its analysis of Proposition EE.  At a September 3, 2020 hearing to consider proposed amendments to the Blue Book, the Legislative Council nonetheless rejected the proposed amendment by Liggett to the Blue Book's description and analysis of the Bill by a vote of 7-10.

84.     The Legislative Council's refusal to include the language proposed by Liggett in the Blue Book excluded Liggett from exercising its right to free speech, in violation of the United States and Colorado constitutions.  Moreover, because the Blue Book does not provide fair, adequate and impartial analysis and information regarding Section 10, the legislative process and the Blue Book are deficient under the Colorado Constitution.

I.      **The Bill Harms Discount Cigarette Manufacturers And Consumers, And Leaves Premium Brands Unaffected**

85.     The Bill on its face purports to be a tax increase aimed to offset the loss of revenue due to COVID-19, but Section 10 has nothing to do with that stated goal.  Section 10 does not enhance revenue by increasing cigarette taxes, but rather only increases the price of discount products greater than the amount of the newly-imposed cigarette tax.  Section 10 serves the interest of premium brand cigarette manufacturers by artificially raising the price of discount brand cigarettes to premium price levels, eliminating price competition in favor of premium brand sellers. The Bill also disproportionately harms consumers of discount cigarettes, by disproportionately

raising prices on the least expensive products, which are typically consumed by persons with lower incomes.

86.     The COVID-19 pandemic and related economic dislocation have caused severe harm to consumers.  COVID-19 has led to 465,000 initial unemployment claims in Colorado and massive job losses, disproportionately hurting low-income workers who are part of the service industry and are unable to work from home.  Section 10 imposes regressive, disproportionate price increases on the most hard-hit Coloradans who elect to smoke less expensive cigarettes.  For Coloradans who smoke discount brand cigarettes, the added cost due to Section 10 could be as high as $800.00 per year.

87.     There can be no public health benefit from handing an even larger share of the cigarette market in Colorado to big tobacco.  In fact, increasing Philip Morris's profits and share will only create even stronger opposition in the future if Colorado attempts to impose taxes and regulations on cigarettes.

### J.     A Preliminary Injunction Precluding The Implementation Of Enforcement Of Section 10 Is Necessary To Avoid Irreparable Harm

88.     A preliminary injunction precluding the implementation and enforcement of Section 10 on January 1, 2021, and during the pendency of this action, is necessary to avoid irreparable harm to Plaintiffs.

89.     Plaintiffs are likely to succeed on the merits in this case.  Section 10 is patently unconstitutional and invalid, by, among other things, impermissibly burdening interstate commerce and violating Plaintiffs' First Amendment and Fourteenth Amendment rights.  There is no legitimate state interest served by Section 10.

90.     Plaintiffs will also suffer immediate and irreparable harm if Section 10 takes effect. The harm will be immediate because Section 10 requires Plaintiffs to nearly double the price of their cigarettes the moment the provision goes into effect, which will prevent Plaintiffs from being able to compete and sell their products in Colorado.  It will be irreparable because Plaintiffs will suffer an irretrievable loss of sales, good will, and market share.  By contrast, the State will suffer no material harm if enforcement of Section 10 is enjoined.

## V.     CLAIMS FOR RELIEF

### COUNT 1 AGAINST THE STATE OF COLORADO, GOVERNOR POLIS, AND ATTORNEY GENERAL WEISER – VIOLATION OF COMMERCE CLAUSE, ARTICLE I, SECTION 8, OF THE UNITED STATES CONSTITUTION

91.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1-90 above as if fully set forth herein.

92.     Plaintiffs are out-of-state tobacco manufacturing companies with no physical presence in Colorado.  Plaintiffs sell discount cigarette products to Colorado consumers indirectly through a stream of commerce, by selling cigarette products through a network of in-state wholesalers and retailers.

93.     Section 10 discriminates against the out-of-state Plaintiffs in favor of in-state retailers and sellers in violation of the Commerce Clause because the additional proceeds generated by the retail sale of cigarettes at the state-imposed higher minimum price is realized as revenue and profit by in-state retailers and/or distributors, not by Plaintiffs.  Thus, in-state sellers reap the benefits of Section 10 at the expense and to the detriment of the out-of-state Plaintiffs who will suffer economic and irreparable harm.  The State can provide no justification, aside from unfairly benefitting in-state interests, for this discrimination, particularly in light of the alternative means

available to the State for raising revenue (such as the excise taxes that are already included in the Bill).

94.     Section 10 also violates the Commerce Clause because it unjustifiably burdens and interferes with interstate commerce and the market for discount cigarettes.  As a result of Section 10, Plaintiffs and other discount cigarette manufacturers will be unable to sell their products in Colorado, a burden which is excessive in relation to any putative local benefit that may be attributed to the state law.  There is no state interest that justifies the harm caused to Plaintiffs.

95.     Additionally, Section 10 has impermissible extraterritorial effects beyond the borders of the State of Colorado that interfere with and burden interstate commerce.  Section 10 will severely undermine the long-standing regime for the regulation, sale, and pricing of cigarettes throughout the United States.

96.     Accordingly, Section 10 violates the Commerce Clause, Article I, Section 8, of the United States Constitution and should be declared void as unconstitutional and enjoined from taking effect.

### COUNT 2 AGAINST THE STATE OF COLORADO, GOVERNOR POLIS, AND ATTORNEY GENERAL WEISER – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE II OF THE CONSTITUTION OF THE STATE OF COLORADO

97.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1-96 above as if fully set forth herein.

98.     Section 10 is unreasonable, arbitrary, and capricious, as it targets and causes disproportionate harm to discount cigarette manufacturers, including Plaintiffs, as well as Colorado citizens and residents and other persons who buy, sell, and/or consume discount and lower-priced cigarettes in Colorado.

99.     Section 10, without any legitimate state purpose, authorizes the State to raise and fix the retail price of discount cigarette products sold to consumers in Colorado.

100.    If not enjoined, Defendants' unreasonable, arbitrary and capricious conduct will violate Plaintiffs' due process property rights and cause irreparable harm to Plaintiffs.

101.    Accordingly, Section 10 should be declared void as unconstitutional and enjoined from taking effect.

**COUNT 3 AGAINST THE STATE OF COLORADO, GOVERNOR POLIS, ATTORNEY GENERAL WEISER, AND LEGISLATIVE COUNCIL – VIOLATION OF EXERCISE OF FREE SPEECH UNDER THE FIRST AMENDMENT**

102.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-101 above as if fully set forth herein.

103.    Defendant Legislative Council is a committee of the Colorado General Assembly tasked, among other things, with preparing and approving the ballot information booklet that provides Colorado voters with information about ballot measures in advance of elections.

104.    Article V, Section 1(7.5) of the Colorado Constitution ("Section 1(7.5)") sets forth the requirements for the Blue Book, which is an analysis of ballot proposals and provides information to the voters about the measures on which they will vote.

105.    The Blue Book affects the voting and election process with respect to ballot initiatives, and Section 1(7.5) regulates the Blue Book process.  Section 1(7.5) requires, among other things, "a fair and impartial analysis of each measure … includ[ing] … the major arguments both for and against the measure," and "permits any person to file written comments for consideration by the research staff during the preparation of such analysis."

106.    Notwithstanding these requirements, the Blue Book contains virtually no analysis of the provision, and major arguments against the provision, which are required by Section 1(7.5), were excluded.

107.    On September 1, 2020, Liggett filed proposed amendments which would have corrected inaccuracies and misinformation contained in the Blue Book.  (*See supra* Section IV.H). However, on September 3, 2020, the Legislative Council rejected Liggett's amendments, which contained corrections to material inaccuracies and misleading portions of the Blue Book, is protected speech under the First Amendment.

108.    By refusing to include Liggett's amendments to the Blue Book, without any compelling state interest, Defendants took action which violated Liggett's First Amendment rights.

109.    Accordingly, Section 10 should be declared void as unconstitutional and enjoined from taking effect.

## COUNT 4 AGAINST THE STATE OF COLORADO, GOVERNOR POLIS, ATTORNEY GENERAL WEISER, AND LEGISLATIVE COUNCIL – VIOLATIONS OF THE COLORADO CONSTITUTION

110.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-109 above as if fully set forth herein.

111.    Article V, Section 20, requires that every measure referred to a committee of reference of either house "be considered by the committee upon its merits," and any action taken in violation of Article V, Section 20 is null and void, pursuant to Article V, Section 22b.  After the Bill was referred to both the House and Senate Finance Committees, the Bill was not considered upon its merits.

112.    Article V, Section 21 requires that every Bill contain only a single subject.  That single subject must be clearly expressed in the Bill's title.

113.    The Bill contains more than one subject in violation of Article V, Section 21.  First, the Bill concerns the subject of taxes on various cigarette and tobacco products.  Second, the Bill includes Section 10, which sets a minimum price per pack of cigarettes at $7.00 in 2021, and $7.50 from 2024 onward.  Section 10 thus concerns a subject other than tobacco or cigarette taxes.

114.    Further, the title of the Bill does not include, identify, or reference Section 10 or its contents.

115.    Article V, Section 22, requires that every bill "shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present."

116.    The General Assembly failed to ensure that the full title of the Bill was read upon the final reading in the House of Representatives.

117.    Article V, Section 1(7.5), requires that the Blue Book contain "a fair and impartial analysis of each measure, which shall include a summary and the major arguments both for and against the measure, and which may include any other information that would assist understanding the purpose and effect of the measure.  Any person may file written comments for consideration by the research staff during the preparation of such analysis."

118.    By rejecting the amendments Liggett submitted to the Legislative Council regarding Section 10, the Legislative Council failed to correct inaccuracies and misleading content in the Bill and failed provide information that would assist voters understand the purpose and effect of the measure.

119. Defendants' violations of, and failure to comply with, the aforementioned provisions of the Colorado Constitution have caused harm to Plaintiffs. Accordingly, Section 10 of the Bill must be declared void as unconstitutional and enjoined from taking effect.

## PRAYER FOR RELIEF

120. WHEREFORE, based on the foregoing, Plaintiffs respectfully request that this Court grant the following relief:

A. A preliminary injunction precluding the enforcement of Section 10 during the pendency of this action;

B. A final judgment in favor of Plaintiffs declaring that Section 10 is void as a matter of law and permanently enjoining Defendants from implementing and enforcing Section 10;

C. An order awarding Plaintiffs' costs, interests, and attorneys' fees incurred in connection with the commencement and prosecution of this action; and

D. Such other relief as the Court shall deem just and proper.

## DEMAND FOR A JURY TRIAL

121. Plaintiffs demand a trial by jury of all issues so triable.

Dated:   October 15, 2020



Marc E. Kasowitz
Daniel R. Benson
Leonard A. Feiwus
Deva Roberts
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax: (212) 506-1800
Email:  lfeiwus@kasowitz.com


Maria Gorecki
KASOWITZ BENSON TORRES LLP
1400 16th Street
16 Market Square, Suite 400
Denver, CO 80202
Tel:  (720) 932-8303
Fax: (720) 932-8300
Email:  mgorecki@kasowitz.com

Jon Anderson
MAVEN LAW GROUP
1800 Glenarm Place, Suite 950
Denver, CO 80202
Phone: 303-218-7141
Email: janderson@mavenlawgroup.com

*Attorneys for Plaintiffs Liggett Group LLC, Vector Tobacco Inc., and Xcaliber International Ltd., LLC*