**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03107

JENNIFER ANN SMITH, a citizen and taxpayer of
the State of Colorado, LIGGETT GROUP LLC,
VECTOR TOBACCO INC., and XCALIBER
INTERNATIONAL LTD., LLC,

Plaintiffs,

v.

STATE OF COLORADO, by and through JARED S.
POLIS, in his official capacity as Governor of
Colorado, PHILIP J. WEISER, in his official capacity
as Attorney General of Colorado, and HEIDI
HUMPHREYS, in her official capacity as Interim
Executive Director of the Colorado Department of
Revenue,

Defendants.

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

1400 16th Street, Suite 400
Denver, Colorado 80202
(720) 932-8303

-and-

MAVEN LAW GROUP
1800 Glenarm Place,
Denver, Colorado 80202
(303) 218-7150

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

CERTIFICATION OF GOOD FAITH EFFORTS TO RESOLVE DISPUTED ISSUES
    PURSUANT TO RULE 7.1(a) OF DISTRICT OF COLORADO LOCAL RULES......... 1

INTRODUCTION ................................................................................................. 2

STATEMENT OF FACTS ..................................................................................... 5

ARGUMENT ....................................................................................................... 12

I.    PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON
      THE MERITS ......................................................................................... 12

      A.    Section 10 Violates The Commerce Clause................................. 12

      B.    The Enactment Of Section 10 Violates The Colorado Constitution......... 18

II.   PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM
      ABSENT INJUNCTIVE RELIEF ........................................................ 21

III.  THE BALANCE OF INTERESTS WEIGH IN PLAINTIFFS' FAVOR ............ 23

IV.   A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC
      INTEREST ............................................................................................. 23

V.    NO SECURITY SHOULD BE REQUIRED ........................................ 24

CONCLUSION ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ........................................................................23, 24

*Baker v. Carr*,
    369 U.S. 186 (1962).................................................................................................12

*Baldwin v. G.A.F. Seelig, Inc.*
    294 U.S. 511 (1935)........................................................................................ *passim*

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers*,
    27 F.3d 1499 (10th Cir. 1994) ................................................................................16

*Brown-Forman Distillers Corp. v. New York State Liquor Auth*,
    476 U.S. 573 (1986)...........................................................................................17, 18

*Chamber of Commerce of United States v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ................................................................................22

*Cloud Peak Energy Inc. v. United States Dep't of Interior*,
    415 F. Supp. 3d 1034 (D. Wyo. 2019).....................................................................24

*Complete Angler, LLC v. City of Clearwater Fla.*,
    607 F. Supp. 2d 1326 (M.D. Fla. 2009)...................................................................25

*Continental Oil Co. v. Frontier Refining Co.*,
    338 F.2d 780 (10th Cir. 1964) ................................................................................24

*Cooke v. Markwell*,
    Case No. 19-CV-30973 (Denver Dist. Ct. Mar. 19, 2019) .....................................20

*Dennis v. Higgins*,
    498 U.S. 439 (1991).................................................................................................24

*Doe v. Pittsylvania County, Va.*,
    842 F.Supp.2d 927 (W.D. Va. 2012) .......................................................................25

*Doubleclick Inc. v. Paikin*,
    402 F. Supp. 2d 1251 (D. Colo. 2005).....................................................................23

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*,
    86 F. Supp.2d 1102 (D. Kan. 2000).........................................................................21

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ................................................................................12

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
    916 F.3d 792 (10th Cir. 2019) ..............................................................................21

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)............................................................................13, 16

*Granholm v. Heald*,
    544 U.S. 460 (2005)...........................................................................................13

*Grayeyes v. Cox*,
    No. 4:18-CV-00041, 2018 WL 3830073 (D. Utah Aug. 9, 2018)...........................24

*Grossman v. Dean*,
    80 P.3d 952 (Colo. App. 2003) ..........................................................................22

*Healy v. Beer Institute, Inc.*,
    491 U.S. 324 (1989)...............................................................................15, 17, 18

*In re House Bill No. 1353*,
    738 P.2d 371 (Colo. 1987) ..................................................................................19

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)............................................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)............................................................................................16

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ...........................................................................13

*KT.& G Corp v. Attorney Gen. of State of Okla.*,
    535 F.3d 1114 (10th Cir. 2008) ...........................................................................13

*Marigold Foods, Inc. v. Redalen*,
    809 F. Supp. 714 (D. Minn. 1992) .......................................................................17

*New Energy Co. of Indiana v. Limbach*,
    486 U.S. 269 (1988)...............................................................................12, 14, 16

*Otero Sav. & Loan Ass'n v. Fed. Reserve Bank*,
    665 F.2d 275 (10th Cir. 1981) .............................................................................21

*People v. Hull*,
    8 Colo. 485 (1885) .............................................................................................19

*Pharmaceutical Soc'y of N.Y. v. Dep't of Soc. Serv.*,
    50 F.3d 1168 (2nd Cir. 1995)..............................................................................24

*Pike v. Bruce Church Inc.*,
    397 U.S. 137 (1970)..............................................................................13, 16

*In re Proposed Initiative "Public Rights in Waters II,"*
    898 P.2d 1076 (Colo. 1995).................................................................20

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ..........................................................24

*Sullivan v. Siegal*,
    125 Colo. 544 (1952) .....................................................................19, 21

*Thomas v. Kaven*,
    765 F.3d 1183 (10th Cir. 2014) ..........................................................22

*In re Title, Ballot Title & Submission Clause for 2005-2006 No. 74*,
    136 P.3d 237 (Colo. 2006)...................................................................21

*Toomer v. Witsell*,
    334 U.S. 385 (1948)............................................................................22

*Tri-State Generation & Trans. Ass'n v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ............................................................21

*V-1 Oil Co. v. Utah State Dep't of Pub. Safety*,
    131 F.3d 1415 (10th Cir. 1997) ..........................................................16

*Valdez v. Applegate*,
    616 F.2d 570 (10th Cir. 1980) ............................................................21

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)................................................................15, 16, 17

**Other Authorities**

Colorado Constitution ....................................................2, 18, 19, 20, 23, 24

Federal Rules of Civil Procedure ................................................................27

U.S. Constitution................................................................................ *passim*

**CERTIFICATION OF GOOD FAITH EFFORTS TO RESOLVE DISPUTED ISSUES
PURSUANT TO RULE 7.1(a) OF DISTRICT OF COLORADO LOCAL RULES**

Plaintiffs' counsel confirms they have made good faith efforts to confer with counsel for each Defendant regarding this motion and have attempted to resolve the disputed issues as required by Rule 7.1(a) of the Local Rules of Practice of the United States District Court for the District of Colorado—Civil and that, notwithstanding such efforts, each Defendant opposes this motion and the relief it seeks.

## **INTRODUCTION**

Plaintiffs Jennifer A. Smith, a Colorado citizen and voter ("Smith"), and Liggett Group LLC ("Liggett"), Vector Tobacco Inc. ("Vector"), and Xcaliber International Ltd., LLC ("Xcaliber"), three discount cigarette manufacturers located outside Colorado (collectively, the "Manufacturer Plaintiffs"), respectfully move for a preliminary injunction enjoining the State of Colorado from enforcing a recently enacted statutory provision mandating, as of January 1, 2021, a minimum retail price for all cigarettes sold in Colorado, on the grounds that its enforcement would violate the Commerce Clause of the United States Constitution and that it was enacted in violation of the Colorado Constitution.

The minimum retail price provision, Section 10 of Colorado House Bill 20-1427 (the "Bill"), requires steep increases in the retail prices of the discount cigarettes Plaintiff Smith smokes and the Manufacturer Plaintiffs sell.  The Bill, enacted through a legislative ballot referral, Proposition EE, and approved by Colorado voters on November 3, 2020, as originally proposed was to provide only for cigarette tax increases.  The Section 10 minimum price provision was later inserted into the Bill, in an unseemly political backroom deal, solely to buy the support of Philip Morris, the country's dominant premium cigarette manufacturer, which competes with the discount manufacturers and which had successfully spent millions of dollars opposing previous tax increase ballot referrals.

As shown below, Section 10's minimum retail price provision is invalid and may not be enforced for two reasons.  First, Section 10 violates the Commerce Clause by favoring in-state interests – namely, in-state cigarette retailers who collect and keep the price increases – at the expense of the Manufacturer Plaintiffs and other out-of-state discount cigarette manufacturers, which lose the price differential between premium cigarettes and discount cigarettes, the basis on which those discount manufacturers compete with premium manufacturers such as Philip Morris.

2

Without that differential, as the tax increases take effect, premium cigarette smokers have no incentive to switch to discount cigarettes, and discount smokers gain the incentive to switch to comparably priced premium cigarettes – all to the benefit of in-state retailers at the expense of the out-of-state discount manufacturers (and Colorado consumers).  This kind of discrimination against out-of-state economic interests in favor of in-state interests is precisely the kind of burden on interstate commerce the Commerce Clause proscribes.

Second, the Bill is invalid because – in violation of clear Colorado constitutional requirements – the State failed to properly disclose to the voters that in addition to tax increases to fund education and other public purposes, the Bill contained the minimum price mandate in Section 10, from which the State would derive no benefit.  Likewise, the State failed to disclose to the voters that, like the in-state retailers, Philip Morris stood to benefit enormously from the Section 10 price increases or that the minimum price provision was added to the Bill precisely to buy Philip Morris's support.  The egregious failure to disclose these and other critical facts – apparently in recognition of the fact that if the voters knew them, they would reject the Bill – renders the Bill void and unenforceable under Colorado law.

Accordingly, Plaintiff Smith, as a Colorado voter who was misled by the improper disclosure and a discount cigarette smoker who would be harmed by the Section 10 discount cigarette price increases, seeks to enjoin the enforcement of Section 10.  Plaintiff Smith voted for Proposition EE because she understood from the State's disclosures in the Bill and the 2020 Ballot Information Booklet that the Bill would only impose new cigarette taxes to generate revenue for public purposes, including education, which she favored.  Had the State properly disclosed, as it was required to do, that it would also raise the retail prices of discount cigarettes well above the amount of the new taxes not for public purposes but for the benefit of Colorado cigarette retailers

3

and Philip Morris, she would have voted against it.  Unless the enforcement of Section 10 is enjoined, not only will Plaintiff Smith have unknowingly voted for a provision she in fact opposed, but she will also be compelled to pay almost twice as much to purchase her discount brand cigarettes, with more than half of that increase going to Colorado retailers, not as tax revenue to the State.  This is precisely the result – contrary to Colorado law – of which she was not informed before voting and which she opposes.

The out-of-state Manufacturer Plaintiffs seek to enjoin the enforcement of Section 10 because, by requiring the discount cigarettes they manufacture and sell in Colorado to sell at or near the same price as the premium cigarettes with which they compete solely on the basis of price, the Manufacturer Plaintiffs' ability to sell cigarettes in Colorado will inexorably be substantially damaged if not entirely destroyed.  The out-of-state Manufacturer Plaintiffs will, absent an injunction, suffer irreparable harm because, without price competition, they will irretrievably lose sales, market share and goodwill in the Colorado market, which they will be unable to recover.  By contrast, the State would suffer no harm from the granting of the requested preliminary injunction because it derives no material benefit from the minimum price provision and it would continue to be free to collect the cigarette taxes provided for in other Sections of the Bill.

Plaintiffs therefore respectfully request that the Court maintain the *status quo* by enjoining the Defendants from enforcing Section 10 pending the Court's final adjudication of Plaintiffs' claims.

## STATEMENT OF FACTS[1]

The Manufacturer Plaintiffs are companies based outside of Colorado which manufacture and sell cigarettes in interstate commerce throughout the United States.  (Shipe Decl. ¶ 4; Taylor Decl. ¶ 12.)  They sell their products in the "discount segment" of the domestic cigarette market by pricing their products lower than the cigarettes in the premium segment.  (*Id.*)  The Manufacturer Plaintiffs sell their cigarettes to consumers in Colorado though distributors and retailers.[2]  (Shipe Decl. ¶ 10; Taylor Decl. ¶ 7.)

In the U.S. market, the established premium brand cigarettes, including Philip Morris's Marlboro, command higher prices based on name or brand recognition.  (Shipe Decl. ¶ 8.)  Most, if not all, of the premium cigarette brands sold today were established long before cigarette marketing and advertising were restricted more than 20 years ago.  (*Id.*)  Since those restrictions took effect, it has become essentially impossible to create, support or launch a new premium brand cigarette or to compete in the domestic cigarette market through conventional consumer advertising. (*Id.*)  The premium brand cigarettes enjoy a competitive advantage, commanding higher prices, more dominant market share, and greater brand recognition, over the discount cigarette brands.  (*Id.*)  Manufacturer Plaintiffs and other discount manufacturers thus compete with Philip Morris and other premium brand manufacturers almost exclusively on price.  (*Id.*)

The Manufacturer Plaintiffs do not, and cannot, set the retail prices for their cigarettes in Colorado or elsewhere.  (*Id.* ¶ 11.)  Because the cigarette market is national in scope, and because the Manufacturer Plaintiffs sell their cigarettes to wholesalers and distributors at a single

---

[1] Citations to the "Am. Compl." refer to the Plaintiffs' Amended Complaint, dated and filed on November 19, 2020 (ECF No. 11.)

[2] Submitted herewith in support of the motion are the Declaration of Plaintiff Jennifer Ann Smith, dated November 19, 2020 ("Smith Decl."); the Declaration of Steven Shipe, dated November 19, 2020 ("Shipe Decl."); and the Declaration of Derrick Taylor, dated November 18, 2020.

nationwide Manufacturers' List Price ("MLP").  (*Id*.)  Once the Manufacturer Plaintiffs' cigarettes are sold to wholesalers and distributors, additional costs, such as state-specific taxes and profit margins are applied by these market intermediaries, and the retail price to the end consumer is set by the retailer at the point of sale.  (*Id*. ¶ 12.)  Moreover, because the Manufacturer Plaintiffs do not and cannot control where the wholesalers and distributors sell their cigarettes, they cannot vary prices by state.  (See *id*. ¶¶ 11-12.)

Discount brand cigarettes have been able to compete with premium brand cigarettes, by attracting price-conscious adult consumers who do not want to pay the higher prices for premium brands.  (*Id*. ¶ 9.)  As Philip Morris has acknowledged, that price competition from discount cigarette brands has increasingly threatened sales of the company's premium brands.  (Am. Compl. ¶ 43.)  In April and May of 2020, Philip Morris's parent company, Altria, stated that the economic downturn caused by the COVID-19 pandemic would cause more adult smokers to switch from expensive premium brand cigarettes to lower-priced discount cigarette brands, threatening Philip Morris's huge profits as a premium cigarette manufacturer.  (*Id*.)

The Manufacturer Plaintiffs sell discount brand cigarettes in Colorado at average retail prices between $3.80 and $5.40 per pack, generating millions of dollars of annual sales.  (*See id*. ¶¶ 20-22; Shipe Decl. ¶ 13; Taylor Decl. ¶ 12.)  By comparison, premium brand cigarettes in Colorado currently sell at average retail prices of between $6.50 and $7.50 per pack.  (Shipe Decl. ¶ 16.)

The Bill's new Colorado cigarette tax increase of $1.10 per pack becomes effective on January 1, 2021.  (Am. Compl. ¶ 29; Shipe Decl. ¶ 19; Taylor Decl. ¶ 12.)  Because the tax portion of the Bill will generally bring premium retail prices above the $7.00 minimum price fixed by Section 10, premium brand cigarettes sold by Philip Morris and other premium manufacturers will

be unaffected by Section 10's new minimum price requirement.  (*See* Am. Compl. ¶ 30; *see also* Shipe Decl. ¶¶ 19-21.)

In contrast, Section 10 compels retail prices of discount cigarettes in Colorado to rise disproportionately higher, well in excess of the $1.10 cigarette tax increase.  (*See id*.)  Under Section 10, the Colorado retail prices of the Manufacturer Plaintiffs' discount cigarettes must increase from between $3.80 and $5.40 per pack to at least $7.00 per pack.  (*See id*.)  While revenue generated by the State cigarette tax increase will go to the State, the additional proceeds generated on discount cigarettes as a result of the minimum price law will be collected at the point-of-sale and kept by Colorado retailers.  (*See* Am. Compl. ¶ 29; *see also* Shipe Decl. ¶¶ 19-22.)  Thus, to the extent that Colorado customers purchase discount brands at the higher $7.00 mandated price, the proceeds generated by the Section 10 minimum price will go neither to the State nor to the out-of-state discount cigarette manufacturers, but directly into the pockets of the Colorado retailers who sell them.  (*See* Shipe Decl. ¶ 22.)

A.   **The Minimum Price Provision Will Irreparably Harm Out-Of-State Discount Cigarettes Manufacturers**

If not enjoined, the enforcement of the Section 10 minimum price provision will severely impair – if not outright eliminate – price competition in the cigarette market, causing discount brand manufacturers to lose sales, profits and market share.  (*Id*. ¶¶ 20-21; Taylor Decl. ¶ 12.) Colorado consumers who smoke premium brands will no longer have any price incentive to switch to what had been, but no longer will be, less expensive discount brand cigarettes, even when confronted with the substantial new cigarette tax increase.  (*Id*.)  Current consumers of discount cigarettes, like Plaintiff Smith, who years ago switched from premium cigarettes to discount products in order to save money, will no longer have an economic incentive to remain customers of discount products.  (Smith Decl. ¶¶ 4-5, 9.)  The increased economic costs imposed by the new

law will thus disproportionately fall on discount brand consumers, who will bear the burden of both the $1.10 excise tax increase and the minimum price increase.  (Shipe Decl. ¶ 21.)

The minimum price provision will thus dramatically and disproportionately reduce demand for discount cigarettes and preclude discount cigarette manufacturers from being able to compete effectively to sell their cigarettes.  (*Id*. ¶¶ 19-21; Taylor Decl. ¶ 12.)  Unless enforcement of Section 10 is preliminarily enjoined, the Manufacturer Plaintiffs will lose millions of dollars of annual sales and profits of their discount cigarettes in Colorado, as well as customers, market share and good will it took them years to establish, all of which they will be unable to recover even if they ultimately prevail in this lawsuit.  (Shipe Decl. ¶¶ 19-21, 23; Taylor Decl. ¶¶ 12-13, 15-16.)

However, the minimum price provision will have the opposite impact on Colorado cigarette retailers.  (Shipe Decl. ¶ 22.)  By eliminating price competition, the provision will protect retailers from losing sales of premium cigarettes, as the tax increases take effect, by eliminating the price incentive for Colorado consumers to switch to discount brand cigarettes.  (*Id*.)  Moreover, the legally mandated higher price on discount brand cigarettes increases the profit margin for those products at the point of sale.  (*Id*.)  The practical effect of the minimum price law will be to drive down demand for discount products, to the detriment of the Manufacturer Plaintiffs, but Colorado retailers will make more money on higher margins selling fewer discount brand cigarettes.  (*Id*.)  This economic protectionism comes at great cost to the out-of-state Manufacturer Plaintiffs who will irretrievably lose substantial sales, profits and market share due to the elimination of price competition in Colorado.  (*See id*. ¶¶ 19-21, 23; *see also* Taylor Decl. ¶¶ 12-13, 15-16.)

No other state has sought to raise the price of cigarettes by imposing a fixed minimum retail price.  (Shipe Decl. ¶ 18.)  States that have sought to raise cigarette prices have preserved relative price differences between discount and premium cigarettes, by simply raising excise taxes

on all cigarettes equally or enacting "minimum mark-up laws," which impose percentage increases on the wholesale and retail prices of cigarettes.  (*Id.*)

Whatever Colorado's asserted purpose is for the minimum price provision, its true purpose and effect is to benefit sellers of premium cigarettes.  (*See* Am. Compl. ¶¶ 87-90; *see also* Shipe Decl. ¶¶ 18-21.)  For years, Colorado's efforts to raise cigarette taxes had been frustrated because of multi-million dollar advertising campaigns funded by Philip Morris in opposition.  (*See* Am. Compl. ¶¶ 35-42.)  The public record is replete with evidence that Philip Morris lobbied for and secured favorable modifications to the proposed Bill, including in particular the inclusion of the minimum price provision, in exchange for its agreement not to oppose the tax increase.[3]  The minimum price law imposes an effective tariff on out-of-state discount cigarettes in order to benefit Colorado retailers who sell Marlboro and other premium priced cigarettes.  (*See* Am. Compl. ¶¶ 28, 33-34; *see also* Shipe Decl. ¶¶ 18-21.)

Knowing that disclosing the backroom deal with Philip Morris to add a provision for its benefit and the benefit of cigarette retailers – with none of the benefits of Section 10 going to the State – would jeopardize its chances of gaining voter approval, Defendants and other proponents of the Bill worked behind closed doors, keeping information about Section 10 hidden from public discourse and even from legislators.  (*See* Am. Compl. ¶¶ 44-47, 68-72.)  The Bill was rushed through the General Assembly in fewer than four days without adequate notice and hearing in violation of Colorado's constitutional requirements.  (*See id*. ¶¶ 66-79.)  The Bill was touted to legislators and the public as a tax on cigarettes and other nicotine products to generate revenue for public purposes, such as education and housing.  (*See id*. ¶¶ 48-49, 57.)  By contrast, Section 10

---

[3] (*See* Am. Compl., Ex. F.)

was buried in the 39-page Bill and excluded from the Bill title in contravention of State constitutional law.  (*See id*. ¶ 87.)

**B.     Plaintiff Smith, Like Other Colorado Voters, Was Misled Into Voting For The Bill And, Like Other Colorado Cigarette Consumers, Will Be Irreparably Harmed By The Minimum Price Law**

Plaintiff Smith, a 53 year-old lifelong resident of Colorado, has smoked a pack of cigarettes per day for the last 38 years.  (Smith Decl. ¶ 3.)  Plaintiff Smith purchases her cigarettes at retail stores and gas stations in Colorado.  (*Id*.)  Until approximately ten years ago, Plaintiff Smith smoked Marlboro cigarettes, but switched to a discount brand called Sonoma to save money.  (*Id*. ¶ 4.)  Since Plaintiff Smith switched from Marlboro to Sonoma, she had consistently purchased Sonoma or, if those were unavailable, other comparably priced discount cigarettes.  (*Id*.)  Earlier this year, however, due to the economic pressures brought on by the COVID-19 pandemic, Plaintiff Smith switched from Sonoma brand cigarettes (which were selling for $50 per carton) to Edgefield brand cigarettes (which were selling for $36 per carton) to save money.  (*Id*. ¶ 5.)  She has smoked Edgefield cigarettes, which Plaintiff Xcaliber manufactures, ever since.  (*Id*.)

In September 2020, Plaintiff Smith received a copy of the 2020 Colorado Ballot Information Booklet, also known as the Blue Book.  (*Id*. ¶ 6, Ex. A.)  On October 9, 2020, Plaintiff Smith received a mail-in ballot for the 2020 General Election, which she completed and returned to the Arapahoe County Clerk on October 13, 2020.  (*Id*. ¶ 6.)  Plaintiff Smith voted in favor of Proposition EE, based on information provided by the State with her mail-in ballot, which stated that Proposition EE would increase State taxes on cigarettes and other tobacco products.  (*Id*.)  Plaintiff Smith knew that she would have to pay more for cigarettes in taxes to pay for State programs.  (*Id*. ¶¶ 6-7.)

At the time she placed her vote, Plaintiff Smith believed that Proposition EE provided only for tax increases on cigarettes and other tobacco products which would generate revenue for public purposes.  (*Id.* ¶ 7)  However, Plaintiff Smith was not aware when she voted that Proposition EE included a provision that would fix the retail price of cigarettes at $7.00 per pack beginning January 1, 2021, nor was she aware that the revenue generated from Section 10 would benefit private parties, including Colorado retailers who sell cigarettes.  (*Id.* ¶ 8.)  Plaintiff Smith would have voted against Proposition EE had she been aware of these additional facts.  (*Id.*)  The minimum price provision will harm Plaintiff Smith and other Colorado consumers of discount brand products.  (*See id.* ¶¶ 8-9; *see also* Am. Compl. ¶ 32.)  Currently, Plaintiff Smith purchases Edgefield cigarettes at $3.80 per pack.  (*See* Smith Decl. ¶¶ 7-8.)  The cost of her Edgefield cigarettes will almost double to $7.00 per pack by virtue of the minimum price law, even though only $1.10 of the price increase is tax revenue to the State.  (*See id.*)  The minimum price law not only conflicts with her decision to support Proposition EE, it will defeat her original decision to save money by switching from Marlboro to discount cigarettes. (*See id.* ¶¶ 4, 7-9.)

If the State is permitted to implement the minimum price law on January 1, 2021, it will cause economic harm to Plaintiff Smith by raising the annual cost of her cigarettes by approximately $1,100 per year (damages she will be unable to recover even if she prevails in this lawsuit), and will eliminate the option to purchase the discount brand cigarettes she prefers.  (*See id.* ¶ 9.)  To the extent she continues to purchase her current brands, she will be paying a "premium" of $2.10 per pack over the new tax as additional profits to the retailer from whom she buys them. (*See id.* ¶¶ 7-9.)  At about one pack per day, the new law will increase Plaintiff Smith's cigarette expense by $1,100 per year, only $400 of which is cigarette tax and the remaining $700 as additional revenue for the Colorado retailer where she buys them.  (*See id.*)

11

## ARGUMENT

This Court has the authority to enjoin the enforcement of state laws that violate the United States Constitution and federal statutes.  *See, e.g., Baker v. Carr*, 369 U.S. 186, 247 (1962). To obtain preliminary injunctive relief, plaintiffs must show that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury without such an injunction; (3) the balance of interests weighs in their favor; and (4) the injunction will not be adverse to the public interest.  *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).  As set forth below, Plaintiffs establish all four factors.

## I.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Section 10 Violates The Commerce Clause

Section 10 violates the Commerce Clause of the U.S. Constitution, which grants Congress the exclusive power to "regulate Commerce … among the several States."  U.S. Const. Art. I, § 8, cl. 3.  The explicit grant of exclusive power to Congress under the Commerce Clause implicitly prohibits a state, under what has been termed the "dormant Commerce Clause," from passing legislation which improperly discriminates against interstate commerce, *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273-74 (1988) (citing cases), or which is "designed to benefit in-state economic interests by burdening out-of-state competitors."  *Id.*

The Supreme Court thus routinely strikes down state statutes that violate the dormant Commerce Clause prohibition:

> Time and again, this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). *See also New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). This rule is essential

> to the foundations of the Union. The mere fact of nonresidence
> should not foreclose a producer in one State from access to markets
> in States.

*Granholm v. Heald,* 544 U.S. 460, 472 (2005). In *Granholm,* the Court struck down a state regulatory scheme that granted in-state wineries but not out-of-state wineries access to the State's consumers on preferential terms, *id.* at 474, on the ground that a state law violates the Commerce Clause, not only when it explicitly prohibits out-of-state businesses from doing business in the state, but also when it erects barriers that make it "impractical from an economic standpoint" to do so. *Id.* at 466.

The Tenth Circuit has noted that a state statute may violate the dormant Commerce Clause in three ways:

> First, a statute that clearly discriminates against interstate commerce
> in favor of intrastate commerce is virtually invalid *per se* and can
> survive only if the discrimination is demonstrably justified by a
> valid factor unrelated to economic protectionism. Second, if the
> statute does not discriminate against interstate commerce, it will
> nevertheless be invalidated under the *Pike v. Bruce Church Inc.,* 397
> U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), balancing test
> if it imposes a burden on interstate commerce incommensurate with
> the local benefits secured. Third, a statute will be invalid *per se* if it
> has the practical effect of extraterritorial control of commerce
> occurring entirely outside the boundaries of the state in question.

*KT.& G Corp v. Attorney Gen. of State of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) (quoting *Grand River Enterprises Six Nations, Ltd. v. Pryor,* 425 F.3d 158 (2d Cir. 2005)).

Here, Section 10, which makes it "impractical from an economic standpoint," for the Manufacturer Plaintiffs to do business in Colorado, violates the dormant Commerce Clause in each of these ways. First, it discriminates against, and unduly burdens, out-of-state discount cigarette manufacturers selling their cigarettes into Colorado. (*See* Am. Compl. ¶¶ 28-34; *see also* Shipe Decl. ¶¶ 19-22.) The minimum price law artificially raises the retail price of discount brand cigarettes in Colorado to premium price levels, preventing price competition and denying discount

cigarette manufacturers the ability to compete in the Colorado market.  (*See* Am. Compl. ¶¶ 28-34, 52-56; *see also* Shipe Decl. ¶¶ 19-22; Taylor Decl. ¶ 11.)   As a result of Section 10, the Manufacturer Plaintiffs will be unable to compete in the State and will lose millions of dollars of annual sales and profits as their sales volumes and market shares decline.  (Shipe Decl. ¶ 19; *see also* Taylor Decl. ¶ 13.)

Economic barriers erected expressly, or in practical effect, by state laws that favor in-state interests to the detriment of out-of-state interests are *per se* discriminatory and violate the Commerce Clause.  *Baldwin v. G.A.F. Seelig, Inc.* 294 U.S. 511 (1935) (price restrictions which required out-of-state producers to cut profits in order to sell into New York State held unconstitutional).  "Where discrimination is patent," the Supreme Court explains, "neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *Limbach,* 486 U.S. at 276 (striking state statute that disadvantaged only one out-of-state manufacturer).

By disproportionately raising the retail price of discount cigarettes relative to premium cigarettes, Section 10 discriminates against the Manufacturer Plaintiffs by making it virtually impossible to sell their discount cigarettes into the State.  (*See* Am. Compl. ¶¶ 28-34, 52-56; *see also* Shipe Decl. ¶¶ 19-22.)  While erecting this barrier for discount cigarettes, Section 10 provides preferential treatment in favor of Colorado cigarette retailers who sell premium cigarettes.  (*See* Am. Compl. ¶¶ 28-34, 52-56; *see also* Shipe Decl. ¶¶ 19-22.)   Section 10 protects Colorado retailers from the negative economic effects of rising cigarette prices by closing the price differential between premium brand and discount brand cigarettes, thereby eliminating the incentive for premium brand customers to switch to discount cigarettes.  (*See* Am. Compl. ¶¶ 33-34, 52-56; *see also* Shipe Decl. ¶ 22.)  By eliminating price competition from out-of-state discount

14

cigarettes, Colorado retailers continue to sustain profits on more expensive premium brand products.  (*See* Am. Compl. ¶¶ 28, 33-34, 52-56; *see also* Shipe Decl. ¶ 22; Taylor Decl. ¶ 12.)  Moreover, the minimum price law further protects Colorado retailers by increasing their profit margins on discount brand cigarettes at the point of sale.  (*See* Am. Compl. ¶¶ 12, 28-34, 52-56; *see also* Shipe Decl. ¶ 22.)  Thus, to the extent that Colorado retailers continue to sell discount brand cigarettes, the minimum price law effectively subsidizes them by permitting them to make the same, or more, profit even though they may be selling substantially fewer discount brand cigarettes.  (*Id.*)

Although Section 10 appears neutral on its face in setting a uniform minimum price for all cigarettes in Colorado, in fact, it has the practical effect of discriminating by raising the retail price of discount cigarettes substantially more than premium brands, which harms the out-of-state Manufacturer Plaintiffs and creates benefits for in-state cigarette retailers.  *See W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186 (1994) (neutral milk tax that funded subsidy for in-state dairy farmers violated the Commerce Clause).  In *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511 (1935), the Supreme Court struck down a New York law establishing a minimum price that milk dealers had to pay farmers, regardless of whether the farmers were in New York or out-of-state.  This law created an economic barrier by prohibiting milk dealers from purchasing milk at a competitive market price for sale in New York State.  Thus,

> Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents.  Restrictions so contrived are an unreasonable clog upon the mobility of commerce.  They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.

*Baldwin,* 294 U.S. at 527.  The Supreme Court has more recently observed  that, "because the minimum price regulation [in *Baldwin*] had the same effect as a tariff or customs duty –

neutralizing the advantage possessed by lower cost out-of-state producers – it was held unconstitutional." *West Lynn Creamery,* 512 U.S. at 194; *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350-51 (1977) (invalidating state regulation that stripped away the competitive advantage of out-of-state producers).

Thus, Section 10 benefits Colorado retailers by creating preferential conditions for in-state retailers to sell premium products, and increasing their profit margin on the sale of discount brand cigarettes. (*See* Am. Compl. ¶¶ 28-34, 52-56; *see also* Shipe Decl. ¶¶ 19-22.) These same price increases imposed by the State operate like a tariff, creating barriers for the Manufacturer Plaintiffs to sell their discount cigarettes into the State. (*Id.*) Like the price restrictions in *Baldwin*, Section 10 has the effect of "short-circuiting normal pricing decisions" for cigarettes sold within the State, precluding the Manufacturer Plaintiffs from fair competition and their ability to sell their cigarettes into the State. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 171 (2d Cir. 2005).

Section 10 also violates the Commerce Clause because the "the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).[4] The State cannot demonstrate a legitimate state interest or benefit sufficient to justify Section 10. *Limbach*, 486 U.S. at 274 ("If a statute is found to discriminate, it may only be upheld if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism."). There are clear alternatives to achieve the state's putative interests

---

[4] Whether a state purpose "could be promoted as well with a lesser impact on interstate activities" is central to the *Pike* inquiry. *See, e.g.*, *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Cty. of Rogers*, 27 F.3d 1499, 1512 (10th Cir. 1994) (reversing grant of summary judgment where State provided no evidence establishing local benefit); *Pike*, 397 U.S. at 142. The Tenth Circuit has held that "impacts that fall more heavily on out-of-state interests," like the burdens of Section 10, are central to this inquiry. *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997) (alterations and internal quotation marks omitted).

without eliminating price competition and burdening sales into the State.  *Hughes v. Oklahoma*, 441 U.S. 322, 336-37 (1979) (requiring state to establish "absence of nondiscriminatory alternatives"); *Marigold Foods, Inc. v. Redalen*, 809 F. Supp. 714, 724 (D. Minn. 1992) (enjoining discriminatory price control where state proffered "no evidence that other less burdensome means of raising revenue . . . [were] not available").  As demonstrated by a majority of the states, including its neighbor states, Nebraska and Oklahoma, Colorado could have employed equitable alternatives, such as minimum mark-up laws, to raise cigarette prices without distorting free market competition and realizing the discriminatory effects on interstate commerce.  (*See* Shipe Decl. ¶¶ 18-22.)  Where, as here, the State has more effective, non-discriminatory alternatives, Section 10's burden on interstate commerce is clearly excessive in relation to any putative, state benefit.

Finally, Section 10 has the practical effect of improper extraterritorial control of commerce beyond Colorado.  Laws that implement price controls, such as Section 10, are routinely stricken down as violating the dormant Commerce Clause due to their propensity to have significant extraterritorial effects.  *See, e.g., Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-22 (1935) (invalidating price control statute that harmed competition outside of the regulating state); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986) (invalidating price affirmation statute that controlled prices and prevented competition in out-of-state markets); *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 332 (1989) (same).

If Section 10 is upheld, neighboring and other states across the country could enact essentially identical fixed minimum price laws, thus destroying price competition, not merely within Colorado, but well beyond.  *See Healy*, 491 U.S. at 339 ("the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by

considering . . . what effect would arise if not one, but many or every, State adopted similar legislation.").  This would impermissibly allow Philip Morris and other large premium cigarette manufacturers and their affiliate retailers to engage in state-by-state "price gridlock," and secure market dominance not merely in Colorado but throughout the country.  *See Healy*, 491 U.S. at 340 (noting that "price gridlock" resulting from price control statute would not be "limited to individual regions").  This domino effect is precisely the kind of "interact[ion] with the legitimate regulatory regimes of other States" that the U.S. Supreme Court has explained violates the dormant Commerce Clause.  *See, e.g., Baldwin*, 294 U.S. at 521-22; *Brown-Forman*, 476 U.S. at 579; *Healy*, 491 U.S. at 332, 336. Were other states permitted to adopt similar measures, the Manufacturer Plaintiffs and other discount manufacturers would be denied the opportunity to compete throughout the United States.  Such extraterritorial effects are unconstitutional in violation of the Commerce Clause.

### B.    The Enactment Of Section 10 Violates The Colorado Constitution

Plaintiffs have a substantial likelihood of success on their claims brought under Article V, Sections 20 (failure to consider the Bill on its merits in committee), 21 (failure to clearly express the Bill's subject matter in the Bill title and inclusion of a second subject), 22 (failure to properly read the Bill on the House floor) and 1(7.5) (failure to include required information about Section 10 in the Blue Book) of the Colorado Constitution.

Section 21 of the Colorado Constitution provides in pertinent part:

> No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.

Colo. Const. art. V, § 21.  Pursuant to the Colorado Constitution, if any subject matter is included in a bill or statute but not clearly expressed in its title, that particular subject matter is void and the

rest remains law.  *See Sullivan v. Siegal*, 125 Colo. 544, 551-52 (1952); *see also People v. Hull*, 8 Colo. 485, 489 (1885) (holding that a provision of the statute that was not expressly set forth in the bill title is void).  This bright line rule avoids the inclusion of "disconnected and incongruous matters" and restricts the contents of the Bill to a single subject that are clearly identified in its title.  *Sullivan*, 125 Colo. at 551-52.

Section 10 violates this constitutional mandate because the minimum cigarette price law is not identified in the Bill title even though it is a substantive component of the proposed legislation. Moreover, because Section 10 concerns a minimum price restriction, a subject separate and distinct from the taxes identified in the Bill title, its inclusion in the Bill is also a violation of the Colorado Constitution.  The failure to include the minimum cigarette price provision in the title of the Bill is a *per se* violation of the Colorado Constitution, the remedy for which is declaring void that specific provision of the Bill.  *See Sullivan*, 125 Colo. at 549 (voiding portion of law not properly expressed in bill title); *Hull*, 8 Colo. at 489 (voiding the sections of statute not expressed within bill title).

Moreover, Section 10 fails because it was not properly considered by the General Assembly prior to its passage as required by Section 20 of the Colorado Constitution.  (*See* Am. Compl. ¶¶ 66-79, 102.)  Section 20 "requires that every measure shall be considered by the committee upon its merits[,]"which means more than a "mere vote on a bill," and at least "some kind of hearing or committee interaction and allowing an opportunity for the public to give testimony, if appropriate."  *Grossman v. Dean*, 80 P.3d 952, 962 (Colo. App. 2003) (internal quotation marks omitted).  Here, the Bill was rushed through the General Assembly in a mere four days, with minimal notice, time for review, comment or discussion by the legislators and the

appropriate committees in the Colorado House of Representatives and Senate.  (*See* Am. Compl. ¶¶ 66-79, 102.)

Thereafter, the Bill was improperly passed by the General Assembly without a full third reading of the Bill title in the Colorado House, which Section 22 of the Colorado Constitution requires.  (*See id.* ¶¶ 76, 106-107.)  "If either house violates this requirement in enacting a law, the law so enacted is invalid."  *Cooke v. Markwell*, Case No. 19-CV-30973, Order Granting Preliminary Injunction at 2 (Denver Dist. Ct. Mar. 19, 2019) (order granting preliminary injunction against computer reading of bills in Colorado Senate) (citing *In re: House Bill 250*, 57 P. 49, 50 (Colo. 1889)).  Under Section 22, even if the Colorado House agrees to forego the reading of the entire Bill on the floor prior to a vote, the title of the Bill must still be read.  (*See* Am. Compl. ¶¶ 76, 106-107.)  The official recorded proceedings of the third reading of the Bill in the House shows neither the Bill nor the full Bill title was read as required by the Colorado Constitution.  For these additional reasons, Section 10 and the Bill itself should be void.  (*Id.*)

Finally, the State rejected appropriate efforts by the Manufacturer Plaintiffs to correct the description of the Bill in the voter information booklet known as the Blue Book.  (*Id.* ¶¶ 80-86, 108-109.)  Article V, Section 1(7.5) requires that the Blue Book include:

> [a] fair and impartial analysis of each measure, which shall include a summary and the major arguments both for and against the measure, and which may include any other information that would assist understanding the purpose and effect of the measure.

The Manufacturer Plaintiffs proposed amendments to the Blue Book that would have corrected inaccuracies and provided additional corrective information regarding arguments against Proposition EE.  (Am. Compl. ¶¶ 80-86, 108-109.)  Specifically, the Manufacturer Plaintiffs proposed amendments would have explained the additional costs to Colorado smokers due to Proposition EE and added the $7.00 per pack minimum price to the list of the primary effects of

Proposition EE.  (*See id.* ¶¶ 82-86.)  However, the proposed Blue Book amendments were rejected by the State in their entirety for no asserted or legitimate reason.  (*Id.* ¶ 82.)  By rejecting these proposed amendments, the State failed to comply with Section 1(7.5), which requires a "fair and impartial analysis of each measure," providing further grounds to void Section 10.  (*Id.* ¶¶ 82-86, 108-109.)

## II.   PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

As set forth above, if Section 10 is enforced, the Plaintiffs will sustain substantial irreparable harm.  In the Tenth Circuit, "any deprivation of any constitutional right" constitutes an irreparable injury.  *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019),

Moreover, the substantial and irretrievable economic harm to Plaintiffs arising from the enforcement of warrants the requested relief.  (*See* Shipe Decl. ¶¶ 17-21, 23; *see also* Taylor Decl. ¶¶ 12-13, 15-16; Smith Decl. ¶¶ 4, 7-9.)  As a matter of law, the loss of customers or business constitutes irreparable harm.  *See, e.g., Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp.2d 1102, 1107 (D. Kan. 2000); *see also Tri-State Generation & Trans. Ass'n v. Shoshone River Power, Inc.,* 805 F.2d 351, 356 (10th Cir. 1986); *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank,* 665 F.2d 275, 278 (10th Cir. 1981); *Valdez v. Applegate,* 616 F.2d 570, 572 (10th Cir. 1980).  If Section 10 goes into effect, Manufacturer Plaintiffs' discount cigarette products will drastically increase in price (in some cases nearly doubling) to premium price levels, preventing them from engaging in fair competition in the market.  (Shipe Decl. ¶¶ 18-21, 23; Taylor Decl. ¶¶ 12-13, 15-16.)  Manufacturer Plaintiffs reasonably anticipate the loss of millions of dollars of annual sales of cigarettes in Colorado as a result of the minimum price law.  (*Id.*)  Moreover, the

Manufacturer Plaintiffs also reasonably anticipate the loss of customers, market share and goodwill from the price distortions caused by Section 10. (*Id.*)

Plaintiff Smith will also be irreparably harmed by Section 10. Based on her current usage of one pack of cigarettes per day, Plaintiff Smith reasonably anticipates that, absent injunctive relief, she will be required to pay approximately $1,100 more per year for her cigarettes as of January 1, 2021. (*See* Smith Decl. ¶¶ 4, 7-9.)

Plaintiffs have also shown the harm alleged is imminent, as Section 10 will go into effect on January 1, 2021. At that time, the Manufacturer Plaintiffs will immediately lose their ability to compete on price and Plaintiff Smith will be required to pay at least $70.00 per carton for her cigarettes. (*See* Shipe Decl. ¶¶ 17-21, 23; *see also* Taylor Decl. ¶¶ 12-13, 15-16; Smith Decl. ¶¶ 4, 7-9.)

There is no adequate remedy at law for the harm alleged. The economic harms alleged by Plaintiffs in the absence of the requested injunctive relief cannot be remedied or reversed if they ultimately prevail in the lawsuit because: (i) the effects of the minimum price law on the cigarette market will permanently change the *status quo;* and (ii) Colorado is immune from compensating Plaintiffs for violating their constitutional rights. *See Chamber of Commerce of United States v. Edmondson,* 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."). The Attorney General similarly has qualified immunity from such damages. *Thomas v. Kaven,* 765 F.3d 1183, 1194 (10th Cir. 2014). Consequently, Plaintiffs' financial harm will be irreparable. *See Toomer v. Witsell,* 334 U.S. 385 (1948) (Commerce Clause challenge to enforcement of state law constitutes irreparable harm when enforcement "result[s] in a substantial loss of business for which no compensation c[an] be obtained.").

## III.     THE BALANCE OF INTERESTS WEIGH IN PLAINTIFFS' FAVOR

Where, as here, Plaintiffs demonstrate that their constitutional rights have been violated, it follows that granting injunctive relief is consistent with the balance of the interests in this case. While the Plaintiffs' constitutional rights will be irreparably harmed absent injunctive relief, the Defendants will suffer no harm if the injunction is granted.  (*See* Shipe Decl. ¶¶ 17-21, 23; *see also* Taylor Decl. ¶¶ 12-13, 15-16; Smith Decl. ¶¶ 4, 7-9.)  As the Tenth Circuit has made clear, "when the law that [Defendants] wish to enact is likely unconstitutional, their interests do not outweigh [Plaintiffs] in having [their] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).

The minimum price law known as Section 10 — the only provision of the law Plaintiffs seek to enjoin — is economic protectionism that directly benefits Colorado retailers, and does not materially benefit the State.  (*See* Shipe Decl. ¶¶ 17-23; *see also* Taylor Decl. ¶¶ 12-13, 15-16; Smith Decl. ¶¶ 4, 7-9.)  Nor would any purported state interest outweigh the profound interest of protecting Plaintiffs' constitutional rights.

The preliminary injunctive relief Plaintiffs seek will have minimal effects, if any, on the State.  Plaintiffs only seek to enjoin Section 10, not the entire Bill.  Thus, the tax revenue from new and increased taxes the Bill imposes on cigarettes and other products will be collected by and available to the State starting on January 1.

## IV.     A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC INTEREST

Enforcement of the Commerce Clause and the Colorado Constitution would serve the public interest.  "The final showing that [Plaintiffs] must make is that the preliminary injunction will not be adverse to the public interest." *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1260 (D. Colo. 2005) (citation omitted).  Here, the public interest will be served by entry of a preliminary injunction to maintain the status quo while Plaintiffs' constitutional claims are litigated.  "It is

always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1131. Conversely, "[t]he public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (citing cases). Because constitutional rights, including Plaintiffs' rights under the Commerce Clause and the Colorado Constitution, are implicated here, a temporary injunction designed to prevent the enforcement of a potentially unconstitutional law is not adverse to the public interest. *See generally Dennis v. Higgins,* 498 U.S. 439, 448-50 (1991). Nor is it in the public interest to raise prices of the lowest priced cigarettes disproportionately higher in order to protect and benefit the economic interests of Colorado retailers, particularly when many price conscious consumers who use discount cigarette brands are already suffering the effects of the current economic climate.

## V.     NO SECURITY SHOULD BE REQUIRED

Rule 65(c) of the Federal Rules of Civil Procedure provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Under this rule, the Tenth Circuit and other courts have long held that "[d]istrict courts have wide discretion in determining whether to require security . . . ." *Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034, 1053 (D. Wyo. 2019) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009)); *see also Pharmaceutical Soc'y of N.Y. v. Dep't of Soc. Serv.*, 50 F.3d 1168, 1174 (2nd Cir. 1995). Moreover, where there is no showing of a likelihood of harm, district courts routinely require no security at all. *See, e.g., Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir. 1964); *see also Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003); *Grayeyes v. Cox*, No. 4:18-CV-00041, 2018 WL 3830073, at *9 (D. Utah Aug. 9, 2018). And where a preliminary

injunction would merely require compliance with the Constitution, no security is required. *See, e.g.*, *Grayeyes*, 2018 WL 3830073, at *9 (waived bond requirement where "[the] preliminary injunction enforced fundamental constitutional rights"); *Doe v. Pittsylvania County, Va.*, 842 F.Supp.2d 927, 937 (W.D. Va. 2012) (fixing the bond at zero dollars where an injunction merely required compliance with the Constitution); *Complete Angler, LLC v. City of Clearwater Fla.*, 607 F. Supp. 2d 1326, 1335-36 (M.D. Fla. 2009) (same).

Here, the State stands to receives *none* of the proceeds of the Section 10-mandated cigarette price increases, and defendants would thus suffer *no* monetary (or other) harm whatsoever if the requested preliminary injunction barring them from enforcing Section 10 is granted, even if it is later determined to have been improvidently granted.  Accordingly, no security should be required.

## CONCLUSION

Plaintiffs' Motion For Preliminary Injunction should be granted in its entirety, and a bond should not be required.

Dated:   November 19, 2020

           KASOWITZ BENSON TORRES LLP

           By: _____/s/ Marc E. Kasowitz_____
                 Marc E. Kasowitz
                 Daniel R. Benson
                 Leonard A. Feiwus
                 Deva Roberts

           1633 Broadway
           New York, New York 10019
           Tel.: (212) 506-1700
           Fax: (212) 506-1800
           Email:  mkasowitz@kasowitz.com

           Maria Gorecki
            KASOWITZ BENSON TORRES LLP
           1400 16th Street
           16 Market Square, Suite 400
           Denver, CO 80202
           Email:  mgorecki@kasowitz.com

                   -and-

           Jon Anderson
           MAVEN LAW GROUP
           1800 Glenarm Place, Suite 950
           Denver, CO 80202
           Phone: 303-218-7141
           Email: janderson@mavenlawgroup.com

           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November 2020 a true and correct copy of the foregoing **MOTION FOR PRELIMINARY INJUNCTION** was served via CM/ECF and via email, with the recipients' consent, upon:

Terry Gill, Acting Deputy Attorney General
Office of the Attorney General, Revenue & Utilities Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, Colorado 80203
(720) 508-6356 Direct
(720) 467-0582 Cell
Terry.gill@coag.gov

Russell D. Johnson, Assistant Solicitor General/Sr. AAG
Colorado Department of Law, Revenue & Utilities Section
1300 Broadway, 8th Floor
Denver, Colorado 80203
Phone: (720) 508-6351
russell.johnson@coag.gov

Ben Kapnik, Assistant Attorney General
Colorado Department of Law
1300 Broadway, 8th floor
Denver, Colorado 80203
(720) 508-6369
Ben.kapnik@coag.gov

By: _____/s/ Marc E. Kasowitz_____
Marc E. Kasowitz

27